IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-00111-RBJ

ROBERT OLDENBURG,

     Plaintiff,

v.

AMERICAN MODERN INSURANCE COMPANY, INC., d/b/a American Modern Property &
Casualty Insurance Company,

     Defendant.

_____

## ORDER

_____

     This matter is before the Court on defendant Midland-Guardian Co. ("AMIG")'s motion for summary judgment on plaintiff Robert Oldenburg's complaint.[1]  ECF No. 29.  For the following reasons, the motion is granted.

### BACKGROUND

     Robert Oldenburg worked as a Senior Territory Sales manager for AMIG for approximately 18 months beginning in January of 2016.  ECF No. 1 at 2.  In this role he was responsible for managing relationships with insurance agencies within his territories and had annual sales goals for the accounts within his territory.  ECF No. 30 at 2.  As part of his employment, Mr. Oldenburg participated in AMIG's sales incentive plan, which rewarded participants who exceeded sales growth goals.  ECF No. 1 at 2.

---

[1] Defendant's motion states that it was improperly designated as "American Modern Insurance Company, Inc. d/b/a American Modern Property & Casualty Insurance Company" in Mr. Oldenburg's complaint. Throughout its motion it refers to itself as "AMIG," so I refer to it as such.

In late 2017, HUB International Services ("HUB") acquired one of the insurance agencies in Mr. Oldenburg's territory, Bank of the West/BW Insurance Agency ("BWINS"). ECF No. 30 at 3. HUB requested that AMIG transfer all books of business from BWINS to HUB. *Id.* HUB was outside of Mr. Oldenburg's territory and managed by another AMIG employee, Deana Efting. *Id.*

In March of 2018 Mr. Oldenburg and his manager, Elvia Alaniz, finalized Mr. Oldenburg's growth sales goals for that year. *Id.* Mr. Oldenburg claims that during this meeting "specific allocations were agreed upon for Mr. Oldenburg's goal concerning BWINS," and that "a new goal for 2018 for HUB [I]nternational would be agreed upon because all of the existing policies written by BWINS would transfer to HUB [I]nternational." *Id.* Mr. Oldenburg claims it was agreed that his goal for BWINS would be $0 and his goal for HUB would be $25,000. *Id.* He claims that in April of 2018 Ms. Alaniz increased his territory sales goals by $377,000 without discussion, failing to account for the transfer of BWINS. *Id.* at 4. He also alleges that the agent now managing the former BWINS business, Ms. Efting, was improperly receiving production credit. *Id.*

This led Mr. Oldenburg to undertake some investigation of the BWINS-HUB transfer. *Id.* According to Mr. Oldenburg he discovered that HUB's transfer request had been incorrectly processed, and that HUB agency offices in California unaffiliated with AMIG would have access to Colorado BWINS policy holder information. *Id.* at 5. On April 24, 2018 Mr. Oldenburg alerted Ms. Alaniz of the issue and suggested that he could manage the HUB agencies. *Id.* During this conversation, Mr. Oldenburg discussed a desire to speak with the AMIG Ethics and Compliance Division about how sales goals were assigned and production credit allocated. ECF No. 30-8. According to Mr. Oldenburg, Ms. Alaniz became "belligerent" when Mr. Oldenburg

raised these and other concerns and noted that she had reported him to human resources.  ECF No. 30 at 5.  In a follow-up email that day, Ms. Alaniz offered to set up such a meeting with the AMIG Ethics and Compliance Division if Mr. Oldenburg was still interested.  ECF No. 30-8.  That day, Mr. Oldenburg contacted the AMIG human resources department to report numerous concerns about his relationship with Ms. Alaniz and the allocation of production credits.  ECF No. 30-7.  In the email he alleged that Ms. Alaniz was "trying to make [Mr. Oldenburg] look bad so she can replace with a younger female."  *Id.*

In mid-May of 2018, Mr. Oldenburg discovered what he identified as "suspicious entries" in AMIG's internal customer relationship management system ("CRM"), which AMIG uses to track interactions with agents.  ECF No. 29-2 at 20.  These suspicious entries related to the transfer of BWINS books of business to HUB International agencies in California.  ECF No. 30 at 6.  According to Mr. Oldenburg, he discovered agency visits to HUB made by Ms. Efting that were backdated.  *Id.*  Mr. Oldenburg claims that these backdated visits "were made in the company database/reporting system in an attempt to deceive the company and Mr. Oldenburg into thinking that Ms. Efting had management responsibilities already assigned to her for HUB International and HUB California and that would validate the production credit for the BWINS transfer business and HUB International new business written with the company."  *Id.*

On approximately May 31, 2018 Kelli Owings from AMIG human resources contacted Mr. Oldenburg about performance issues raised by Ms. Alaniz.  ECF No. 2 at 6.  In an email following their conversations, Mr. Oldenburg raised numerous concerns, including Ms. Alaniz's alleged disparate treatment of male employees, his dissatisfaction with the allocation of production credit, and his discovery of what he believed to be backdated entries made by Ms. Efting.  ECF No. 30-9.  He asked Ms. Owings to "look into" the backdated entries and

production credit allocation. *Id.* He also registered numerous complaints about his supervisor's decisions regarding his sales goals and other performance expectations. *Id.*

On approximately June 15, 2018 Mr. Oldenburg contacted the Ethics and Compliance Division to report his concerns. ECF No. 30-11. On June 27, 2018 Rob Hall of the Ethics and Compliance Division informed Mr. Oldenburg that they had investigated his complaints and determined that the reassignment of agents "was handled in accordance with current Company procedures and was executed in a consistent manner across the Sales Department." ECF No. 30-11. Mr. Oldenburg contacted the department again' and on July 11, 2018 the department followed up, confirming that its investigation revealed no wrongdoing. *Id.*

On July 13, 2018 AMIG fired Mr. Oldenburg. *Id.* On December 4, 2018 Mr. Oldenburg filed this case in the District Court for the City and County of Denver (Case No. 2018CV34485), claiming wrongful discharge. ECF No. 2. AMIG removed the action to this court on the basis of 28 U.S.C. § 1332(c)(1) diversity jurisdiction. ECF No. 1. Defendants now move for summary judgment. ECF No. 29.

## STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.
The Court will examine the factual record and make reasonable inferences therefrom in the light
most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City
and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## ANALYSIS

Mr. Oldenburg claims he was wrongfully discharged in violation of Colorado public
policy. ECF No. 30 at 7. AMIG claims that Mr. Oldenburg was an at-will employee, he was not
terminated for an unlawful reason, and his termination does not fit within a public policy
exception. ECF No. 29.

AMIG also argues that to the extent Mr. Oldenburg's complaint attempts to assert a claim
for sexual harassment, any such claim also fails as a matter of law. ECF No. 29 at 15. Mr.
Oldenburg states that he does not assert a claim for sexual harassment, ECF No. 30 at 20;
therefore I interpret Mr. Oldenburg's complaint as simply stating a public policy wrongful
discharge claim.

 "In general, employment contracts are at-will and either the employer or the employee
may terminate the relationship at any time." *Rocky Mtn. Hosp. and Medical Service v. Mariani*,
916 P.2d 519, 523 (Colo. 1996) (citing *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708
(Colo. 1987)). However, in *Martin Marietta Corp. v. Lorenz* the Colorado Supreme Court
recognized a limited exception to this rule in cases where "discharge of the employee
contravenes a clear mandate of public policy." 823 P.2d 100, 107 (Colo. 1992) (quoting
*Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984) (en banc)). "The
determination of whether the public policy asserted is a well-defined and fundamental one is an

issue of law" for the court to decide. *Mariani*, 916 P.2d at 524 (quoting *Brockmeyer v. Dun & Bradstreet*, 335 N.W.2d 834, 841 (Wis. 1983)).

Under *Lorenz*, "[a]n employee may state a claim for termination in violation of public policy by alleging that she was employed by the defendant, the defendant fired her, and the defendant discharged her '(1) in retaliation for exercising a job-related right or performing a specific statutory duty, or (2) that the termination would undermine a clearly expressed public policy.'" *Brown v. Premier Roofing, LLC*, 173 F. Supp. 3d 1181, 1184–85 (D. Colo. 2016) (quoting *Underwood v. GEO Group, Inc.*, No. 10-CV-306-LTB-KLM, 2011 WL 5593150, at *15 (D. Colo. Nov. 17, 2011)).

AMIG, understanding Mr. Oldenburg to claim that his discharge fell into the second category, argues that Mr. Oldenburg's "fraud" allegations did not implicate public policy and that, even if they did, they only occurred after his termination and therefore he cannot show he was discharged in retaliation for reporting his allegations. ECF No. 29.

However, Mr. Oldenburg claims that he brings his allegations under the first category, alleging that "his discharge was in retaliation for exercising a job-related right or privilege and performing his public duty." ECF No. 30 at 12–13. Because Mr. Oldenburg states that he "has not alleged that his termination by AMIG undermines a clearly expressed public policy," *id.*, I need only consider whether he can survive a summary judgment motion on his showing under the first category.

Under the first category, "a plaintiff may state a claim for retaliatory discharge in violation of public policy by alleging that: (1) she was employed by the defendant; (2) the defendant discharged her; and (3) the defendant discharged her 'in retaliation for exercising a

job-related right or performing a specific statutory duty.'" *Underwood*, 2011 WL 5593150, at

*15 (*citing Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. App. 2008)).

It is undisputed that Mr. Oldenburg worked for AMIG, and that AMIG fired him in July

of 2019.  ECF No. 29 at 7; ECF No. 30 at 5.  Only the third element is in dispute.  Mr.

Oldenburg claims AMIG terminated him in retaliation "for exercising his public duty and job-

related right or privilege," specifically that he had a right to report "suspected unethical

conduct," namely the CRM irregularities and the allocation of production credits to Ms. Efting.

ECF No. 30 at 13.  AMIG argues both that Mr. Oldenburg was not exercising a job-related right

or statutory duty, and in the alternative, that he cannot show he was terminated as a result of his

exercise of the alleged right.  ECF No. 31 at 1–4.

*Lorenz* held that an employee who has alleged termination for refusal to violate a state-

wide professional code of ethics stated a cognizable wrongful termination claim.  *See Lorenz*,

823 P.2d at 109.  The court has since more clearly defined what constitutes a job-related right

under *Lorenz*.  In *Crawford Rehab. Servs., Inc. v. Weissman*, a plaintiff argued she was

terminated for exercising a job-related right when she complained that her supervisor had

attempted to eliminate her morning and evening rest breaks and she continued to take them.  938

P.2d 540, 552 (Colo. 1997).  The plaintiff argued she had a public policy right to report

violations of the Colorado Wage Order, which entitled her to take rest periods every four hours.

*Id.*  The Colorado Supreme Court concluded that though "an employee terminated for exercising

a job-related right may state a cognizable claim for wrongful discharge in violation of public

policy under certain circumstances . . . such circumstances do not exist in this case" because no

"fundamental, substantial public policy [was] at issue."  *Id.*  The court explained that the alleged

public policy violation at issue "must concern behavior that truly impacts the public in order to

justify interference into an employer's business decisions." *Id.* (quoting *Mariani*, 916 P.2d at 525) (internal quotations omitted). "Any interest [plaintiff] may have pursuant to the Wage Order in taking ten minute rest breaks does not rise to the level of a public-policy mandate susceptible to private enforcement." *Id.* at 553. Essentially, the violation of the job-related right did not substantially implicate public policy such that the court would grant an exception to the at-will presumption.

The court also clarified that "[n]ot all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment." *Id.* "[T]he employee must prove that 'the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's rights as a worker[.]'" *Id.* (quoting *Mariani*, 916 P.2d at 524).

Mr. Oldenburg argues that AMIG's Code of Conduct and Ethics creates a job-related right or privilege to report "any potentially unethical behavior or practices." ECF No. 30 at 15–16. However, as just discussed, the court in *Crawford* held that the employee must show that the employer's behavior must violate a "specific statute" relating to the public health, safety, or welfare or to the employee's rights as a worker. 938 P.2d at 553. A private entity's code of conduct cannot meet this requirement.

Mr. Oldenburg also argues that his "responsibility as a CPCU [(Chartered Property Casualty Underwriter)] requires him to bring forth any actions that he sees could be deceptive or constitute insurance fraud." ECF No. 30 at 16. Again, this argument falls short of the *Crawford* court's requirement: Mr. Oldenburg has not pointed to a specific statute laying out his responsibilities as a CPCU that relate to public health, safety, welfare, or his rights as a worker that his employer's conduct violated or that he was required to violate by his employer.

Finally, Mr. Oldenburg points to a Colorado insurance statute, C.R.S. § 10-1-101 and §

10-1-128.  ECF No. 30 at 9–10.  Section 10-1-101 states the purpose of the title is to

> promote the public welfare by regulating insurance to the end that insurance rates
> shall not be excessive, inadequate, or unfairly discriminatory, to give consumers
> thereof the greatest choice of policies at the most reasonable cost possible . . . .
> Such policy requires at all persons having to do with insurance services to the
> public be at all times actuated by good faith in everything pertaining thereto,
> abstained from deceptive or misleading practices, and keep, observe, and practice
> the principles of law and equity in all matters pertaining to such business.

§ 10-1-101.  Section 10-1-128 provides that

> The general assembly finds and declares that insurance fraud is expensive; that it
> increases premiums and places businesses at risk; and that it reduces consumers'
> ability to raise their standard of living and decreases economic vitality of the state.
> The general assembly further finds and declares that the state of Colorado must
> aggressively confront the problem of insurance fraud by facilitating the detection
> of and reducing the occurrence of fraud through stricter enforcement and
> deterrence and by encouraging greater cooperation among consumers, the
> insurance industry, and the state in coordinating efforts to combat insurance fraud.
> . . . An allegation of a fraudulent insurance act shall not excuse an insurance
> company from its duty to promptly investigate a claim.

§ 10-1-128.  According to Mr. Oldenburg, these statutes establish that "insurance services and

rates to the public must be made in good faith, with the public welfare in mind and that acts of

insurance fraud are a matter of important public policy requiring aggressive enforcement."  *Id.* at

10.  He claims that by reporting the CRM irregularities and Ms. Efting's receipt of production

credit, that he was reporting "tampering and fraudulent measures" that "affect the public welfare

due to public deception and increased insurance rates for the consumer public."  *Id.* at 11.

I conclude that any interest Mr. Oldenburg had under these statutes in reporting the CRM

irregularities and allocation of production credits does not "rise to the level of public-policy

mandate susceptible to private enforcement."  *Crawford*, 938 P.2d at 553.  First, the connection

Mr. Oldenburg alleges between his complaints and the alleged public policy of ensuring fair

insurance rates and preventing insurance fraud is too attenuated.  Mr. Oldenburg argues that the

CRM irregularities and allocation of production credits would likely increase insurance rates for the public because it would increase AMIG's "expense ratio."  ECF No. 30 at 11–12.  His allegations do not support this conclusion.  Mr. Oldenburg alleges that Ms. Efting received production credits that she should not have received.  But this does not clearly correlate with an increase in the company's expense ratio.  In fact, Mr. Oldenburg objected to the allocation because he no longer received such production credits, ECF No. 30 at 4, indicating that rather than increasing expenses, the company merely reallocated existing ones.  Further, Mr. Oldenburg has not shown how the CRM irregularities would have any effect on the company's expense ratio, nor the corresponding public insurance rates.  Even assuming that an increase in insurance rates for the public constitutes a clearly expressed public policy issue of public health, safety or welfare, the alleged conduct is not sufficiently related to that goal.

Second, I do not find that the rights Mr. Oldenburg alleges under these statutes "rise to the level of public-policy mandate susceptible to private enforcement."  *Crawford*, 938 P.2d at 553.  As the *Crawford* court emphasized, "[n]ot all potential sources of public policy are of sufficient gravity to outweigh the precepts of at-will employment."  *Id.*  That court found that minor violations of the Colorado Wage Order did not offend a public policy of sufficient gravity to outweigh the presumption of at-will employment.  Under that high standard, I cannot conclude that Mr. Oldenburg's alleged reporting irregularities and flawed production credit allocation scheme is a sufficiently grave public policy offense to outweigh the at-will employment presumption.

Mr. Oldenburg is correct that in order to show wrongful discharge for "whistleblowing," Colorado courts have not required an employee to show "actual fraud."  ECF No. 30 at 9.  He argues that this means that it was sufficient that he "suspected fraud."  *Id.*  In *Kearl v. Portage*

10

*Environmental, Inc.*, the Colorado Court of Appeals concluded that a plaintiff could state a public policy wrongful discharge claim when he made a "good faith attempt to prevent employer's participation in defrauding the government," without reaching any conclusion on whether an actual fraud occurred.  205 P.3d at 500.  Though Mr. Oldenburg is certainly not required to prove "actual fraud," he is required to show that the alleged "fraud" is of sufficient gravity under *Crawford*.  The facts of *Kearl* show the dissimilarity: there the plaintiff alleged the company had concealed from the government field test failures of an environmental clean-up technology that actually increased the rate at which toxic substances to spread into the groundwater.  *Id.* at 497–98.  Mr. Oldenburg has failed to show that his "suspected fraud" was sufficiently grave, and *Kearl* provides no assistance.

Mr. Oldenburg also points to *Flores v. American Pharm. Servs., Inc.*, 994 P.2d 455 (Colo. App. 1999) as evidence that the need to aggressively confront insurance fraud is a clearly expressed public policy.  *Flores* held that "insurance fraud is the type of behavior that truly impacts the public because it increases premiums, places businesses at risk, reduces consumers' ability to raise their standard of living, and decreases the economic vitality of the state."  994 P.2d at 459.  However, *Flores* did not consider whether the plaintiff had met the *Crawford* standard of showing that action directed by the employer or the denial of the employee's job-related right violated that policy.  I did not reach my conclusion by finding Mr. Oldenburg had not established a clear expression of public policy.  Rather, I concluded that even assuming his cited statute met that requirement, he could not show that he exercised or was denied a right pursuant to that policy.

Because I conclude that Mr. Oldenburg has not provided sufficient evidence that he was exercising a job-related right such that his termination could violate public policy, I find his claim of wrongful discharge does not set forth a cause of action under *Lorenz* and *Crawford*.

## ORDER

Defendant's Motion for Summary Judgment, ECF No. 29, is GRANTED.  This civil action is dismissed with prejudice.  As the prevailing party, defendant is awarded its reasonable costs to be taxed by the Clerk of Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 12th day of May, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge